**UNITED STATES of America, Appellee,**

v.

**Frank D'AMATO et al., Defendants-Appellants.**

**Nos. 591 to 593, Dockets 73-2437 to 73-2439.**

United States Court of Appeals, Second Circuit.

Argued Dec. 21, 1973.

Decided March 14, 1974.

---

Henry J. Boitel, New York City, for defendant-appellant Abramo.

Frank A. Lopez, Brooklyn, N. Y., for defendants-appellants D'Amato and Zito.

Bancroft Littlefield, Jr., Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., for the Southern District of New York, John D. Gordan III, Asst. U. S. Atty., on the brief), for appellee.

Before FRIENDLY, HAYS and OAKES, Circuit Judges.

OAKES, Circuit Judge:

Appellants were the subjects of a two-count indictment, count one charging a conspiracy to possess and distribute heroin in violation of 21 U.S.C. § 846, and count two charging possession and distribution of 487.27 grams of heroin on February 20, 1973, in violation of 21 U.S.C. §§ 812, 841(a)(1) &

841(b)(1)(A).[1] After a five-day jury trial, all appellants were convicted on the conspiracy count. Appellant D'Amato was also convicted on the substantive count; that count was dismissed as against appellant Abramo, and the jury failed to return a verdict on that count with respect to appellant Zito. Appellants challenge their conviction on various grounds: that the evidence was insufficient to sustain the convictions under the conspiracy count; that they were deprived of a fair trial by the trial court's refusal to compel the Government to reveal the name of a paid, registered informant of the Bureau of Narcotics and Dangerous Drugs (BNDD), as of July 1, 1973, the Federal Drug Enforcement Administration (FDEA), so that he could be called as a witness; that the introduction into evidence of deceased coconspirator Frank Burdieri's statements was reversible error because of insufficient indicia of reliability and because those statements were generally not made in furtherance of the conspiracy charged; and that the medical condition of one of the jurors, discovered during the jury's deliberation, entitled them to a new trial or, in the alternative, to a full hearing with regard to the nature of that illness and its effect on the entire proceedings. Appellant Zito further asserts that count two should have been dismissed as to him by the district court. After careful consideration of these arguments, we reject them and affirm the convictions.

## I. SUFFICIENCY OF THE EVIDENCE.

A brief statement of the facts adduced at trial is required. On January 31, 1973, special agent McElroy of the BNDD, acting in an undercover capacity, went to a Manhattan bar accompanied by a paid BNDD informant, who introduced McElroy to the late Frank Burdieri. Burdieri, according to McElroy's testimony, said that he had connections through which heroin could be purchased, one such being appellant D'Amato. D'Amato, said Burdieri, was "very big" in the heroin business, having taken over the heroin operations of one Vinnie Pappa. At the end of this meeting, Burdieri agreed to contact McElroy when he had lined up some heroin.

On February 16, Burdieri informed McElroy that the latter could purchase ½ kilogram of heroin for $13,000, which included a commission of $500 for Burdieri. McElroy told Burdieri that it would take a few days to obtain the money and agreed to meet Burdieri on February 20. On that day, prior to the meeting, McElroy placed $12,900 in a plain white envelope which had been marked for later identification. McElroy, Burdieri and the informant met at noon, at which time Burdieri told McElroy that the money had to be advanced before receipt of the heroin. McElroy refused to "front" the money in this fashion, and Burdieri agreed to find out whether delivery could be effected without the "front" of the money. Later, telling McElroy that he was going to meet "his people," Burdieri exited McElroy's automobile and motioned over to the curb a black 1973 Oldsmobile driven by a person later identified as appellant Zito and carrying a passenger identified as appellant D'Amato. Burdieri spoke through the passenger window to D'Amato and Zito for five to ten minutes, returned to McElroy's automobile and told McElroy that he had just talked to "his people" and that the buy could be made within the next 30 minutes without the moneys being "fronted." Burdieri departed in a taxi to pick up the

---

1. Also charged as a coconspirator in the original indictment was Frank Burdieri, who, as will be seen, acted as a go-between in narcotics transactions that formed the basis of the Government's case. Burdieri was arrested on April 9, 1973, almost two months prior to the arrest of appellant D'Amato and more than two months before the arrests of appellants Abramo and Zito. Burdieri disappeared some 10 days after his arrest and apparently his severely beaten body was found washed up on Silver Beach in the Bronx with one bullet in the back of his head.

heroin and was observed some 35 minutes later walking down a sidewalk carrying a brown paper bag in a newspaper followed by the Oldsmobile containing D'Amato and Zito. Burdieri walked to a coffee shop where he met McElroy; they then went to McElroy's automobile, where Burdieri gave McElroy the bag containing slightly less than ½ kilogram of heroin in exchange for the envelope containing $12,900. Burdieri asked McElroy to drop him off at a specific place because Burdieri had "to meet his people right away to give them the money." At that place, Burdieri was dropped off and immediately picked up by the same Oldsmobile, Burdieri getting into the back seat. The Oldsmobile was followed by other FDEA agents, and they retrieved the marked envelope which was thrown from the automobile by D'Amato. Burdieri was dropped off shortly thereafter. At a meeting on February 23, again with the informant present, McElroy asked Burdieri whether he had taken the money directly to his people on February 20; Burdieri responded in the affirmative.

At a meeting on March 26, Burdieri and McElroy negotiated relative to the purchase of more heroin. Burdieri said that "his people" usually dealt only in four of five kilo quantities of heroin but would sell a half kilo for $12,500 and replied affirmatively to a question by McElroy as to whether they were "the same people" who had furnished the February 20 heroin. They met, after several telephone calls and another meeting on the afternoon of March 27, once again on March 27 at 8:10 p. m., to consummate the purchase of a kilogram in their second transaction at a price of $28,000, Burdieri saying "I've got to meet my people at 9 o'clock" that evening. After McElroy gave him the money and drove Burdieri around for a while so that he could count it, Burdieri was dropped at 23rd Street and Second Avenue. He left and then took a taxi, under considerable observation, to 36th Street and Third Avenue, where he entered a coffee shop at the southwest cor-

ner. At this point, a 1972 blue Lincoln Continental, registered to Mrs. Abramo, which had been waiting down the block, pulled up slowly along 36th Street going east toward the coffee shop and stopped on the opposite side of 36th Street from the shop. Appellant Abramo was driving the Continental, with D'Amato as his passenger. At exactly nine o'clock Abramo and D'Amato got out of the automobile. Burdieri came out, joined them, and the three of them entered the automobile.

After pulling away from the curb, the Continental, followed by a veritable cavalcade of four or five surveillance vehicles, proceeded on a course and at such speeds as to warrant, if not compel, the inference that the surveillance had been detected and that an attempt was being made to escape from it. For example, the car squared two blocks in the midfifties, slowing down and speeding up, drove to the vicinity of Sutton Place, suddenly speeded up again and went by way of the East River Drive and Triborough Bridge to Roosevelt Raceway where Burdieri was let out. The chase then assumed proportions of "The French Connection," for while doing 75 miles per hour on the extreme left lane of the Meadowbrook Parkway towards Queens, a last-second swerve by Abramo across three lanes to the exit for the Long Island Expressway left all but one surveillance vehicle in the lurch. The occupants of that stout automobile observed the dropping off of D'Amato at a telephone booth in Queens, from which he walked 1.3 miles to his home. After twice squaring a three or four block area near the phone booth, Abramo returned his wife's automobile to Manhattan. On March 29, Burdieri explained to McElroy that he had not returned with the package (of heroin) because "agents" had followed him to and during the meeting with "his people."

■ A. *D'Amato and Zito.* The sufficiency of the overall evidence against D'Amato and Zito, given the facts adduced at trial and condensed above, cannot be subject to serious

doubt. The contention that the Government's proof with respect to the February 20 transaction was fatally deficient in that Burdieri was not under surveillance for some 35 to 45 minutes, during which time he *might* have picked up the ½ kilogram of heroin from a source other than the Zito automobile, is not in the least persuasive. The inference apparently drawn by the jury was that Burdieri did in fact obtain the brown package from D'Amato and Zito, and that inference was clearly permitted by the evidence. The jury obviously chose to disbelieve D'Amato's own version of these dealings to which he testified. Examining the record, we also conclude that independent evidence as to the February 20 transaction was sufficient, under the standards enunciated by this court, to permit the introduction of Burdieri's statements through McElroy's testimony as statements made by a coconspirator in furtherance of the conspiracy. These statements were, of course, admitted subject to connection; the mere physical activities of both D'Amato and Zito, as well as the non-hearsay testimony of FDEA agents, establish by a fair preponderance that Burdieri, D'Amato and Zito were in fact coconspirators. United States v. Geaney, 417 F.2d 1116, 1120 (2d Cir. 1969), cert. denied, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). *See* United States v. Manfredi, 488 F.2d 588 at 596 (2d Cir. 1973). The question whether appellants were denied their sixth amendment rights of confrontation as a result of the admission of McElroy's testimony as to Burdieri's statements will be dealt with in Part II *infra.*

Appellant D'Amato's contention that the evidence with respect to the substantive count was insufficient as a matter of law to convict him is frivolous.

B. *Abramo.* In Abramo's case, the sufficiency of the evidence independent of Burdieri's hearsay statements presents us with a considerably more difficult decision. The independent evidence with respect to the March 27 transaction, viewed simplistically, shows only that after Burdieri had driven around in McElroy's automobile, counting the money that McElroy had brought with him, between 8:10 p. m. and 8:50 p. m., Burdieri took a taxi to a coffee shop, which was approached by Abramo in his wife's car and then on foot and from which Burdieri exited to join Abramo and D'Amato in Abramo's automobile, the roundabout chase ensuing, with Abramo ultimately dropping off Burdieri and D'Amato.

We say "viewed simplistically," because the foregoing represents an examination of the evidence without reference to any declaration of Burdieri whatsoever, and treats all of his declarations as inadmissible hearsay. Once we recall, however, that verbal acts—contemporaneous utterances explaining non-verbal conduct or its tenor—are not hearsay in the true sense, since they do not constitute an assertion to evidence the truth of a fact asserted, 6 Wigmore, Evidence § 1772, at 191 (3d ed. 1940), we can separate those declarations of Burdieri admissible for purposes of establishing the existence of a conspiracy for the sale of heroin and Abramo's membership therein, from those inadmissible to show his membership. *See* United States v. Costello, 352 F.2d 848, 853–855 (2d Cir. 1965), rev'd on other grounds sub nom., Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L. Ed.2d 889 (1968); United States v. Annunziato, 293 F.2d 373, 376–377 (2d Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961); Shapiro v. United States, 166 F.2d 240, 242 (2d Cir.), cert. denied, 334 U.S. 859, 68 S.Ct. 1533, 92 L.Ed. 1779 (1948); *see also* Morgan, A Suggested Classification of Utterances Admissible as Res Gestae, 31 Yale L.J. 229, 236 (1922).

Burdieri's declarations that the price was $12,500 for one-half a kilo and $25,000 for a kilo help to explain his conduct in riding around in McElroy's car counting the money before he left for 36th Street and Third Avenue, as relating to the very transaction at issue;

they give that conduct legal significance and they accompanied it. *See* cases cited in 6 Wigmore, *supra,* § 1777, at 204 n. 9; Terry v. United States, 51 F.2d 49 (4th Cir. 1931).[2] From the previous transaction in which D'Amato, Zito and Burdieri were involved, together with the verbal acts of Burdieri in the negotiations for the sale of heroin, it may fairly have been inferred that there was on March 27, 1973, a conspiracy the object of which was the sale of heroin. On this point, certainly the Government was entitled to prove that Burdieri and McElroy were engaged in a transaction involving the sale and purchase of heroin which Burdieri was to obtain from someone and/or some place other than at 23rd Street and Second Avenue. Thus considered, that portion of his utterances to McElroy limited to establishing that a sale of heroin was to take place that evening may be considered as an item of circumstantial evidence in determining whether the preponderance test was met as to Abramo's membership in the conspiracy, even while Burdieri's declaration that he was going to meet "his people" was for purposes of that determination inadmissible hearsay. Given the existence of a conspiracy to sell heroin in which Burdieri was a participant, we must try then, in measuring

the role of Abramo, "to perform the intellectual feat of assessing the independent evidence free from the color shed upon it by the hearsay" [as to Abramo being one of Burdieri's "people"]. United States v. Geaney, 417 F.2d at 1120. Assessing the evidence, we cannot say that it is insufficient to establish Abramo's participation by a fair preponderance, once we draw reasonable inferences from it, as the jury was entitled to do.[3]

■ From the circumstances it can be inferred that the March 27th meeting at the 36th Street and Third Avenue coffee shop between Burdieri—fresh from his $28,000 drive with Agent McElroy and well surveilled taxi drive up from 23rd Street and Second Avenue—and Abramo and D'Amato was not only prearranged but designed to permit counter-surveillance by them of anyone following Burdieri. These circumstances include the fact that Abramo drove slowly down 36th Street and stopped just as Burdieri came into sight, that Burdieri left the coffee shop when D'Amato and Abramo pulled up, and that D'Amato and Abramo left the car at exactly 9:00 p. m. That the meeting was prearranged pursuant to a plan to which Abramo was a party is evident.

2. Burdieri's intent with respect to the meeting of March 27 is relevant to whether a general conspiracy involving narcotics existed as charged. The Supreme Court, in a broadly worded opinion by Mr. Justice Gray, stated:

> The existence of a particular intention in a certain person at a certain time being a material fact to be proved, evidence that he expressed that intention at that time is as direct evidence of the fact as his own testimony that he then had that intention would be. After his death there can hardly be any other way of proving it . . . .

Mutual Life Insurance Co. v. Hillmon, 145 U.S. 285, 295, 12 S.Ct. 909, 912, 36 L.Ed. 706 (1892). *See also* Insurance Co. v. Mosley, 75 U.S. (8 Wall.) 397, 404–405, 19 L.Ed. 437 (1869).

3. The Government argues that "The conspiracy charged here was one among Burdieri, D'Amato, Abramo and Zito to sell heroin generally, not only to sell it to McElroy."

Brief at 22 n.*. Under United States v. Geaney, *supra,* we are to look at *all* of the independent evidence, not just the independent evidence related to the allegedly aborted transaction of March 27. The Government urges not that there was any evidence to tie Abramo to the February 20 sale, the substantive charge having been dismissed as to Abramo, but that the February 20 transaction is independent evidence of Abramo's participation in a general conspiracy because of the similarities in the *modus operandi* of the transactions of that date and March 27. The suggestion is that, since Zito supplied the automobile and was the driver at the February 20 "transaction," then "Judge Cannella was entitled to infer that Abramo was not merely an innocent chauffeur." Government Brief at 18. We need not decide whether the similarities between the two "transactions" were alone sufficient to create a fair preponderance of evidence to establish Abramo's membership in the conspiracy in light of our decision above.

Whether the plan was conspiratorial in nature, however, is another question. On balance we think that the jury may properly have been permitted to answer in the affirmative, drawing the inference first from the fact that the meeting was so arranged that Abramo and D'Amato could observe whether Burdieri was being followed by way of his going into the coffee shop first rather than waiting on the corner, and, second, from the evasive automobile action taken subsequently. One does not intentionally square blocks in mid-Manhattan traffic, stop and then accelerate several times, swerve across three lanes at 75 m. p. h. to take an expressway exit and square large areas in Queens unless he is trying to determine whether he is being followed or, having ascertained that, trying to avoid being followed.

Abramo argues that he was merely attempting to "extricate" himself from "suspicious circumstances," and that he therefore cannot be said to be a member of the conspiracy, relying on United States v. Kearse, 444 F.2d 62, 64 (2d Cir. 1971), and United States v. Euphemia, 261 F.2d 441 (2d Cir. 1958). But, absent Abramo's participation in the conspiracy and knowledge of its object, what could have been the "suspicious circumstances" to which this argument refers? Rather than try to "extricate" himself, indeed it would seem that driving his own wife's car, coming to a prearranged meeting with Burdieri under the circumstances described, and leaving in his auto so as to attempt to avoid or evade surveillance would be consistent only with his membership. Had he innocently thought D'Amato and Burdieri to be involved in a narcotics or other suspicious transaction from which he wished to be disengaged, his conduct in giving them a ride together would hardly have occurred. In short, we believe that the independent evidence, coupled with the proof (through Burdieri's verbal acts) of the existence of a con-

spiracy to sell heroin on March 27, is sufficient to establish Abramo's participation in the conspiracy. Once this is true, of course, at least some of Burdieri's statements, such as that he was going to meet "his people," are evidence admissible inferentially against Abramo also.

## II. THE CONFRONTATION QUESTIONS.

A. *The Burdieri Statements.* In this case, Burdieri was not even theoretically available as a witness for either the Government or the defendants. Appellants, relying on the court's decision in United States v. Puco, 476 F.2d 1099, rehearing and petition for rehearing en banc denied, 476 F.2d 1106 (2d Cir. 1973), contend that Burdieri's statements did not bear sufficient indicia of reliability to make them admissible. The Government counters that such a separate finding is either never required where the admitted testimony was in furtherance of a conspiracy, relying on the dissenting opinions in *Puco*, or, in the alternative, that the statements here did bear sufficient indicia of reliability to make them admissible.

■ It seems clear that virtually all of the extrajudicial statements of Burdieri were not only in furtherance of the conspiracy (of which he was indisputably a member) but were also against his own penal interest. As pointed out in the opinion of Judge Feinberg in the *Puco* panel's denial of a rehearing, assessing the impact of Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), on the well-established coconspirator exception to the hearsay rule is a straightforward task where, as here, the extrajudicial statements were decidedly against the penal interests of the speaker when made. United States v. Puco, 476 F.2d at 1107, *citing* United States v. Weber, 437 F.2d 327, 340 (3d Cir. 1970), cert. denied, 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971).[4]

---

4. Appellants' other contentions with respect to the admission of certain statements made by Burdieri are without merit. We agree with the trial judge, for example, that the

"Vinnie Pappa" statement was clearly relevant, was not "brutally prejudicial," and, again, was made in plain furtherance of the conspiracy.

B. *The Paid Informant.* Appellants contend that the court below abused its discretion in refusing to compel the Government to reveal the name of the paid informant who introduced McElroy to Burdieri and who was present at some meetings with them. A reading of the record convinces us, as it did the court below, that the assertion by appellants that this paid informant was "intricately involved in the transaction of this case," Brief for Abramo at 35, is insupportable. The trial court also quite properly took into account the manner in which Burdieri himself met his demise, note 1 *supra.* Under United States v. Soles, 482 F.2d 105, 108–110 (2d Cir. 1973), we find no abuse of discretion. Appellants' argument that the paid informant could have been called and, if called, might have cast doubt on McElroy's rendition of Burdieri's statements is pure speculation. On the facts before the district court, there was no need that a hearing be held to probe into what the paid informant might or might not have testified to.

## III. THE CLAUSTROPHOBIC JUROR.

After verdicts had been returned as to all appellants on all counts except with respect to Zito on count two, it was determined by the court that one of the jurors was unable to continue. The juror had in fact previously experienced some discomfort, and indeed had been sent to a hospital where the problem was diagnosed as an acute attack of claustrophobia. The court had, however, taken steps to alleviate the strain on the juror; and when the point was reached that the juror could not continue further, a full and most careful examination of that juror and the jury by the court, App. 735a–68a, made it abundantly clear that the claustrophobia had not "adversely affected the challenged juror's ability to decide [the] case intelligently." United States v. Silverman, 449 F.2d 1341, 1344 (2d Cir. 1971), cert. denied, 405 U.S. 918, 92 S.Ct. 943, 30 L. Ed.2d 788 (1972), at least with respect

to the verdicts already returned. There was therefore no prejudice to any defendants on those counts. Appellant Zito argues on appeal, citing no authority, that the failure of the jury to return a verdict as to him on count two required dismissal of that count rather than a mistrial as directed by the court below. But appellant Abramo's brief correctly states the law, which is that a new trial—following the declaration of a mistrial—is the appropriate outcome where a juror has been disqualified. *See* Parker v. Gladden, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966); United States v. Rattenni, 480 F.2d 195 (2d Cir. 1973).

For reasons herein stated, the judgments with respect to appellants are affirmed.