**UNITED STATES of America, Appellee,**

v.

**Leocadio FIGUEROA,
Defendant-Appellant.**

**No. 217, Docket 84–1126.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 26, 1984.

Decided Dec. 18, 1984.

Pierce, Circuit Judge, filed concurring opinion.

**234**

Barry E. Schulman, Brooklyn, N.Y. (Michael A. O'Connor, Andrew A. Bokser, Doreen T. O'Connor, Schulman & Laifer, Brooklyn, N.Y., of counsel), for defendant-appellant.

Michael Chertoff, Asst. U.S. Atty., S.D. N.Y., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Marc J. Gottridge, Asst. U.S. Atty., S.D.N.Y., New York City, of counsel), for appellee.

Before FRIENDLY, MESKILL and PIERCE, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal from a judgment entered in the United States District Court for the Southern District of New York, Bonsal, J., on a jury verdict. Following a four day trial, the jury found appellant Leocadio Figueroa guilty of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846 (1982) and of distributing or aiding and abetting the distribution of cocaine in violation of 21 U.S.C. §§ 812, 841(a)(1) & (b)(1)(A) (1982). Appellant was acquitted on a third charge of possessing cocaine with intent to distribute, also a violation of 21 U.S.C. §§ 812, 841(a)(1) & (b)(1)(A).

The district court judge sentenced appellant to concurrent terms of seven years imprisonment on each of the two counts, to be followed by a three year special parole term on the distribution count. Appellant is serving his sentence.

Figueroa advances three grounds for reversal. Two of these, a challenge to the sufficiency of the evidence and a claim that certain evidence should have been suppressed, are meritless. But Figueroa's final contention is troublesome. Relying on our decision in *United States v. Check*, 582 F.2d 668 (2d Cir.1978), appellant avers that the testimony of an undercover detective incorporated damaging hearsay and that the admission of the testimony was prejudicial error. We agree that the disputed testimony was inadmissible. Further, we cannot say with any degree of certainty that the testimony influenced the jury only slightly or not at all. Therefore, we are compelled by *Check* to reverse Figueroa's conviction and to remand the case for a new trial.

BACKGROUND

Figueroa was charged in three counts of a four count indictment. Count one, the conspiracy count, named appellant Figueroa, his son Leo Figueroa, Jr., Thomas Vazquez and Carolyn Cassell. Count two, the distribution charge, named appellant Figueroa, Leo Figueroa, Jr. and Vazquez. Count three charged appellant Figueroa with possession with intent to distribute. The fourth count, carrying a firearm during the commission of a felony, named Vazquez alone.

Vazquez pled guilty to all counts prior to trial. The government filed an order of *nolle prosequi* as to Cassell. Following the close of the government's evidence, the trial judge granted a Fed.R.Crim.P. 29(a) motion for judgment of acquittal on all counts in favor of Leo Figueroa, Jr. Consequently, only the charges against appellant Figueroa were submitted to the jury.

The government's case at trial centered on events that occurred during a nine day period in early August 1983. Orlando Caprio, an undercover detective from the Essex County, New Jersey prosecutor's office, testified that on August 4, 1983 he and an informant named Mike met with two other men in room 638 of the Skyline Hotel in Manhattan. One of these men

was Vazquez. He was armed with an automatic pistol. Caprio saw an Uzi-type machine gun on the dresser. Caprio also noted an open bag containing packages, some wrapped in foil and some in clear plastic. When one of the packages was opened, Caprio observed that it contained chunks of a white powdery substance. Vazquez identified the substance as high quality cocaine and the men discussed its value. Caprio testified that, while this meeting was going on, Figueroa entered room 638 from the adjoining room. Figueroa neither spoke nor participated in any way. Caprio left soon thereafter, having been in the room for a total of only about five minutes.

Evidence showed that from August 1 to August 12 room 638 was registered to Figueroa and its adjoining room, 639, was registered to Vazquez under an assumed name. A plain metal door in their common wall connected the two rooms.

On August 5, Caprio and George Anarella, an undercover New York City detective assigned to the New York Drug Enforcement Task Force (Task Force), met with Mike. Caprio gave Mike money to purchase a sample of cocaine. Anarella testified that that afternoon he saw Mike enter the Skyline Hotel alone and leave a short time later with Figueroa. Task Force detectives saw the two climb into a dark blue limousine which then headed into the Lincoln Tunnel toward New Jersey.

About an hour and one-half later, Caprio testified, Mike met Caprio in a Newark, New Jersey parking lot. Mike emerged from a blue limousine, entered Caprio's car and handed Caprio a bag containing cocaine. In response to Caprio's request that future deals take place in New Jersey, Mike went and spoke with someone in the limousine, returning shortly to tell Caprio that future deals had to be in New York. The person in the limousine was not identified by Caprio.

Caprio and Mike met again on August 12, 1983 and Caprio made a telephone call to room 638 of the Skyline Hotel. Someone with a low voice and a pronounced Hispanic accent answered. This voice description

matched one of the arresting detectives' description of appellant Figueroa's voice. Caprio addressed this otherwise unidentified party as Leo, asked him what the problem was, said that the money was ready and asked when the deal could be made. Without objecting to being called Leo, the party instructed Caprio to come to New York with Mike and to have Mike call him then. Because the deal was to take place in New York, Caprio was replaced by New York detectives.

On the evening of August 12, Anarella and Lawrence P. McDonald, a New York State Police Investigator assigned to the Task Force, met with Mike. Anarella and Mike then went to a telephone booth not far from the Skyline Hotel. Anarella testified that, in his presence and in accordance with his contemporaneous instructions, Mike made three telephone calls.

Although he was apparently available, Mike did not testify at trial. Consequently, the jury heard about the telephone calls only from Anarella. Figueroa objected to the testimony on hearsay grounds. But, accepting the prosecutor's representations that the conversations were offered not for the truth of the matters asserted but merely as verbal acts, the trial judge admitted the testimony. It is this testimony that Figueroa challenges.

The conversations took little trial time to relate. Each call began with Mike dialing and requesting room 638. The other party and Anarella communicated through Mike. The government persists in characterizing the testimony as simply instructions concerning the drug deal given by Anarella through Mike to the other party. Because the relevant portion of the trial transcript is both central to this decision and brief, it is reproduced in its entirety below:

THE COURT: All right. What did you tell Mike?

THE WITNESS: On that first phone call I told Mike—Mike had asked me if I would go up to the room with the $99,-000.

THE COURT: Right.

THE WITNESS: And I told him to tell the other people no, that if they wanted to see the money they would have to come down, that I wasn't going to the room.

THE COURT: All right. That's what you said.

Q Do you know what room Mike had called?

A After he dialed the phone, he asked for room 638 and there was a short pause, at which time he said, "Hello."

Q He said that into the telephone?

A Yes.

Q After this first telephone conversation about which you've just testified, were there any further telephone conversations?

A Yes.

Q Will you explain how those came about?

A There was a second telephone conversation. Mike went to the phone. He dialed the number and he asked for room 638.

MR. SACHS: I object again to anything that Mike said on the grounds of hearsay. It is being offered for the truth of the things said. There is no way around that, your Honor.

THE COURT: No.

Go ahead. What I'm interested in, you had the second phone call. What happened then?

THE WITNESS: Mike had a conversation and Mike asked me, "Would it be all right if we did the two-kilogram deal one pound at a time?" And I told him to tell the people on the other end of the phone that that would be fine, we would deal one pound of cocaine at a time.

THE COURT: This was a two-kilo deal, one kilo at a time?

THE WITNESS: One pound, of about four and a half pounds, at a time. So we would deliver one pound at a time. And I told Mike to relay the message that that would be fine, that we could do one pound at a time.

THE COURT: All right.

Q After these two telephone conversations, did there come a third telephone conversation?

A Yes. The third telephone conversation—

Q What room did Mike call?

A He asked for—he called 638.

Q And did he ask to speak to anybody?

A Yes. He said "Hello" on the phone again.

Q And can you describe what you heard—what you instructed him to say on the telephone?

A I told—after the conversation, I told Mike—Mike asked me—

MR. SACHS: I object to what Mike asked him. That is hearsay once again.

MR. CHERTOFF: A question can't possibly be hearsay.

THE COURT: No. But what I'm worried about is, you had a third call. What happened then?

THE WITNESS: After Mike had a conversation with the other people on the phone, I told Mike that it would be all right if Leo sent his man down, Tommie, to count the money.

Q Could you repeat what you told—

THE COURT: He said it would be all right for Leo to send his man down to count the money?

THE WITNESS: His man Tommie to count the money.

THE COURT: All right.

Tr. at 69–72.

Task Force detectives, including McDonald, who were staking out the sixth floor of the Skyline ascertained that there were people talking and a phone ringing in room 638 during the time that the calls were made. The detectives saw Vazquez, carrying a bag, leave the vicinity of room 638 just minutes before he appeared on the street to meet Anarella. Vazquez was arrested when he transferred just over a pound of cocaine, which had been in the bag, to Anarella. The arresting officer also relieved Vazquez of a loaded automatic pistol.

The officers on the street then signaled the detectives inside the hotel, who had previously obtained a warrant to search room 638. Thwarting Leo Figueroa, Jr.'s unsuccessful attempt to bar the door, the police entered the room. They found both Figueroa, Jr. and appellant Figueroa inside.

Searching for any potential physical threat to the safety of the officers, McDonald opened the unlocked door connecting rooms 639 and 638. He saw Cassell in bed and drug paraphernalia in plain view. In a drawer by the bed he found some cocaine and some documents.

Appellant Figueroa, Figueroa, Jr. and Cassell were arrested. A search of Figueroa's person produced a small quantity of cocaine—just under thirty grams [1]—and approximately $3,700 in cash, primarily in new, one hundred dollar bills. The search of room 638 revealed drug paraphernalia commonly used for preparing cocaine for street distribution as well as a loaded revolver.

The defense case at trial consisted solely of appellant Figueroa standing before the jury. Presumably this was to rebut certain inaccurate physical identifications which were introduced by the government.

## DISCUSSION

■ Figueroa contends, first, that the evidence was insufficient to support his conviction. We have repeatedly emphasized that an appellant challenging the sufficiency of the evidence bears a heavy burden. *E.g., United States v. Soto,* 716 F.2d 989, 991 (2d Cir.1983); *United States v. Losada,* 674 F.2d 167, 173 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). Viewing the evidence in the light most favorable to the government and construing all permissible inferences in its favor, the court must ask "whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt."

*United States v. Carson,* 702 F.2d 351, 361 (2d Cir.), *cert. denied sub nom. Mont v. United States,* 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983); *see also United States v. Torres,* 740 F.2d 122, 125–26 (2d Cir.1984). Although the evidence against Figueroa was not overwhelming, it was legally sufficient.

■ After carefully considering Figueroa's second claim, that the district court improperly failed to suppress the evidence seized from rooms 638 and 639, we reject that also. The evidence from room 638 was seized pursuant to a warrant. Appellant contends that the district court erred by failing to grant him a hearing to challenge the affidavit supporting the warrant. But such a hearing is required only when a defendant makes a "substantial preliminary showing" that the affiant knowingly, intentionally or with reckless disregard for the truth made false statements and that those statements were necessary to support the finding of probable cause. *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978); *United States v. Orozco-Prada,* 732 F.2d 1076, 1089 (2d Cir.1984); *United States v. Barnes,* 604 F.2d 121, 152 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). The Supreme Court in *Franks,* which established the right to this type of hearing, was concerned that frivolous challenges could lead to unnecessary pretrial delays. Consequently, it adopted the substantial preliminary showing requirement and stressed the need for a "sensible threshold" before a hearing would be required. *Franks,* 438 U.S. at 170, 98 S.Ct. at 2683. Appellant's showing could hardly have been less substantial; he alleged merely that the events described in the affidavit underlying the warrant did not take place. The district court correctly refused to allow a hearing.

■ By failing to challenge the seizure of evidence from room 639 in his motion to

---

**1.** This cocaine was the basis of count three of the indictment which charged appellant Figueroa with possession with intent to distribute.

The cocaine that Vazquez transferred to Anarella was the basis of the charges in counts one and two.

suppress, Figueroa waived his right to challenge it on appeal. *United States v. Nunez-Rios*, 622 F.2d 1093, 1098–99 (2d Cir.1980); *United States v. Natale*, 526 F.2d 1160, 1172–73 (2d Cir.1975), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976). Moreover, Figueroa's standing to challenge that evidence is doubtful because he had no expectation of privacy in room 639. *See, e.g., United States v. Salvucci*, 448 U.S. 83, 92–93, 100 S.Ct. 2547, 2553–2554, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois*, 439 U.S. 128, 148–49, 99 S.Ct. 421, 432–33, 58 L.Ed.2d 387 (1978). Even absent these procedural bars, however, we would uphold the validity of the warrantless search of room 639. Weapons and narcotics are a common combination. Moreover, the arresting officers were aware that the alleged co-conspirators apparently moved freely between the two rooms and that weapons, including a submachine gun, had been seen in room 638. The door between the rooms was unlocked, providing easy access not only for the police, but for anyone who might threaten their physical safety. Indeed, Cassell was actually in room 639 at the time. In light of all of the circumstances, the search of room 639 was reasonable. *See New York v. Belton*, 453 U.S. 454, 457–58, 101 S.Ct. 2860, 2862–63, 69 L.Ed.2d 768 (1981); *Chimel v. California*, 395 U.S. 752, 762–63, 765, 89 S.Ct. 2034, 2039–40, 2041, 23 L.Ed.2d 685 (1969); *United States v. Gomez*, 633 F.2d 999, 1008 (2d Cir.1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981); *United States v. Liberti*, 616 F.2d 34, 36–37 (2d Cir.), *cert. denied*, 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 808 (1980).

■ Figueroa's third argument is that the trial judge committed reversible error when he allowed the government to introduce, over objection, Anarella's testimony about the telephone calls. He also contends that the admission of the challenged testimony violated his rights under the Confrontation Clause of the Sixth Amendment to the Constitution.

The government argues that the evidence was not hearsay because it was offered and admitted only as verbal acts, not for the truth of the matters asserted. In advancing this argument, the government reasons that the testimony merely "recounted the instructions given by Anarella, and did not even purport to reflect statements by Mike." Br. for the United States at 19. The government further maintains that no Confrontation Clause problem exists because the telephone calls were significant only because Vazquez subsequently acted in conformance with the instructions conveyed.

The government's contention that the disputed testimony fell outside of the definition of hearsay because it was not "offered ... to prove the truth of the matter asserted," Fed.R.Evid. 801(c), is disingenuous. If nothing else, the prosecutor's reliance in his summation on the veracity of the substance of the informant's statements belies this argument. The testimony was an obvious attempt to convey to the jury what someone in room 638, presumably appellant Figueroa, allegedly said to Mike concerning the mechanics of the imminent drug deal. Most notably, the testimony gave the jury evidence from which it could find that Figueroa was an active participant in, and indeed even the director of, a large-scale cocaine distribution operation.

While there was never any question of Vazquez's involvement, the prosecution had to connect Figueroa to the August 12 transaction. Without the disputed testimony, the government could only cast suspicion on him. The jury would know only that Figueroa and Vazquez occupied adjoining rooms for a period of time; that, at least occasionally, the two moved between rooms; that Figueroa had gone to New Jersey with Mike on August 5; that Caprio spoke by telephone with someone having a deep voice and Hispanic accent whom he addressed as Leo; and that Figueroa had a loaded weapon in his room as well as a large amount of cash and a small amount of cocaine in his pockets when police arrested him. By indicating that Vazquez took orders from Figueroa and that Figueroa

likely stood to profit from the transaction, the testimony supplied information critical to the prosecution's case.

The government's claim that the testimony was admissible as verbal acts rests on its reasoning that the evidence was significant only when combined with other evidence showing that Figueroa was in room 638 and that Anarella's "instructions" were followed. Again, the prosecutor's summation indicates quite clearly that the significance of the testimony derived from its implication of Figueroa as the person in charge. The prosecutor described the telephone calls as follows:

> So the informant stands downstairs with the undercover agent next to him, and you hear what happens.
>
> He makes several calls up to room 638, again a familiar location. And Leo is on the other end of the line. What does Leo say? Leo says, in sum, "Well, I'm going to send Tommie down and we'll do the deal a pound at a time."
>
> And, sure enough, what happens? [Vazquez goes down and is arrested.]
>
> Now, ladies and gentlemen, is there any doubt, under those circumstances, that Leo Figueroa sent Tommie down?
> . . .
> Just use logic. Leo says, "Tommie is coming down with a pound of cocaine." Moments later, from the direction of room 638 a fellow walks along carrying a paper bag. The same fellow comes down, is arrested with the pound of cocaine, and is later identified as Tommie. Any question about that, ladies and gentlemen? It is crystal clear.

Tr. at 339–40.

The prosecutor did not even bother to characterize the evidence as instructions from Anarella. The reason is obvious: the testimony was significant for the matters asserted; it linked Figueroa to the conspiracy and to the transaction. Anarella was merely "a transparent conduit for the introduction of inadmissible hearsay information obviously supplied by and emanating from the informant." *Check*, 582 F.2d at 678.

The government relies inappropriately on cases that upheld the admission of out of court statements to aid the jury's understanding of certain conduct. In *United States v. D'Amato*, 493 F.2d 359 (2d Cir.), *cert. denied*, 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 50 (1974), for example, an undercover special agent testified to declarations made by his contact who was apparently murdered long before trial. The agent was permitted to relate certain of the contact's statements, primarily concerning the price of heroin and the mechanics of a narcotics transaction, which explained the conduct of the contact and his co-conspirators. Admitting the statements as verbal acts, the court explained that "verbal acts—contemporaneous utterances explaining non-verbal conduct or its tenor—are not hearsay in the true sense, since they do not constitute an assertion to evidence the truth of a fact asserted." *Id.* at 363.

The prosecution's argument in this case was likely inspired by *United States v. Lubrano*, 529 F.2d 633 (2d Cir.1975), *cert. denied*, 429 U.S. 818, 97 S.Ct. 61, 50 L.Ed.2d 78 (1976). Indeed, if the government's characterization of the testimony were correct, *Lubrano* would be essentially on point. The charges against Lubrano were based primarily on drug transactions between himself and Finn, a government informant who died before trial. Peterson, a government agent, had supervised and directed Finn's activities. At trial, Peterson testified to the instructions he had given to Finn.

Unlike Anarella's testimony, Peterson's testimony in *Lubrano* comprised actual instructions and did not incorporate inadmissible hearsay. In relevant part, Peterson stated that he gave Finn serialized currency and told him to meet with Lubrano and arrange to purchase specific amounts of cocaine. *Id.* at 636 n. 2. We held that Peterson's directions to Finn were "relevant to aid the jury in understanding the background events leading up to the crimes in question [,] ... [a]lthough they were inadmissible as proof of the matters asserted." *Id.* at 637 (citations omitted).

Anarella's testimony went well beyond background material. His supposed instructions were merely an artifice to introduce the testimony of an informant whom the government did not wish to put on the stand. If his testimony had truly been limited to statements of instructions given to Mike, its admission as a verbal act would not have been error; it would not have been hearsay. However, from a practical standpoint, Anarella's testimony became a recital by Mike of proposals made by the recipient of the phone calls. In other words, the testimony was used to show directly what the defendant allegedly said to Mike. By incorporating into Anarella's testimony evidence of Figueroa's involvement in the August 12 transaction, the government successfully introduced crucial information while shielding the source of that evidence—the informant—from potentially devastating cross-examination.[2] As we stated in an analogous situation: *"The agent's instructions to the informer* to attempt to purchase cocaine from the defendant constituted the 'background' permitted in *Lubrano.* In the case at bar *the informer's narration to the agent* repeating alleged statements by defendant to the informer was improperly permitted as part of the agent's testimony." *United States v. Ziegler,* 583 F.2d 77, 82 n. 9 (2d Cir.1978). The *Ziegler* language is applicable here.

Anarella's testimony is a clear albeit less egregious example of the evil identified and prohibited in *Check.* To sustain Figueroa's conviction, we would have to undermine our holding in *Check.* The government's primary witness in *Check* was an undercover detective, Spinelli. In his investigation of Check, a fellow police officer suspected of narcotics trafficking, Spinelli worked closely with Cali, a confi-

dential informant who refused to testify at trial. Through some artful questioning, the prosecution sought to introduce the content of the Cali-Spinelli conversations without engendering hearsay problems. Thus the prosecutor repeatedly inquired: " 'Without telling us what Mr. Cali said to you, what did you say to him?' " *Check,* 582 F.2d at 671 (quoting *Check* trial transcript). Spinelli's responses—his alleged statements to Cali—wholly incorporated information which Cali obviously had conveyed to him.[3] *Id.* at 675.

The fact that the declarations in *Check* were offered and admitted without limitation, due to a mistaken belief by the prosecution and the trial judge that they were not hearsay because they were Spinelli's own statements, does not distinguish *Check* from this case. It is clear that here, as in *Check,* the government's purpose in offering the disputed testimony was to prove the truth of the matters asserted therein. *See id.* at 679. Anarella's testimony about the telephone calls

> was a transparent attempt to incorporate into the officer's testimony information supplied by the informant who did not testify at trial. Such a device is improper and cannot miraculously transform inadmissible hearsay into admissible evidence.

*Id.* And, lest there be any misunderstanding by the jury, the prosecutor drove the information relentlessly home in his summation. The whole point of our decision in *Check, see* 582 F.2d at 679, was to stop prosecutors from circumventing the hearsay rule by the kind of atomization here sought to be defended.

The admission of the testimony, which connected Figueroa with the August 12

---

**2.** The informant, Mike, had apparently been blacklisted by the Drug Enforcement Administration. He may also have had an extensive criminal background although that is not clear from the record.

**3.** A portion of his first response suffices as an illustration:

I—after we had the conversation, I instructed William Cali that by no means did I intend

to front any sum of money to Sandy Check, I didn't particularly care for the fact that—initially he was supposed to come with an ounce of cocaine, and the taste which he had, which I was supposed to get prior to making the ounce buy of cocaine, was at his house. . . .

*Check,* 582 F.2d at 671 (quoting *Check* trial transcript).

transaction, was certainly prejudicial. We therefore can sustain Figueroa's conviction only if we are "sure that the error did not influence the jury, or had but very slight effect." *Kotteakos v. United States*, 328 U.S. 750, 764, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); *Check*, 582 F.2d at 684. Three factors here weigh heavily in favor of reversal. First, the hearsay testimony was the only evidence directly implicating Figueroa in the conspiracy and distribution. Second, the government's case against Figueroa, "while entirely sufficient, was not overpowering." *United States v. DiMaria*, 727 F.2d 265, 272 (2d Cir.1984). And finally, the trial judge, while not transcending the bounds of non-partisan propriety, may have additionally highlighted or emphasized the evidence by his participation in the elicitation of the improper testimony and by his restatement of the challenged testimony in his instructions to the jury. Although the trial judge purported to admit the evidence as verbal acts, he alluded to the substance of the declarations when he reviewed the evidence in his charge to the jury. He described the telephone calls between Anarella, Mike and "someone in the apartment who again gave his name as Leo, and they discussed the distribution of cocaine." Tr. at 389.

In light of all of the circumstances and the importance of the disputed evidence to the government's case, we believe that the jury was probably affected. We do not think that a limiting instruction, had one been requested, could have avoided the prejudice. Having determined that the erroneous admission of hearsay testimony mandates the reversal of appellant's conviction, we need not reach his constitutional claim. *Cf. Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 341, 346–48, 56 S.Ct. 466, 480, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

Figueroa's judgment of conviction is reversed and the case is remanded to the district court for a new trial on counts one and two of the indictment.

PIERCE, Circuit Judge, concurring:

I concur in the judgment of the majority. I write separately, however, to point out that in *Check*, heavily relied upon by the majority, the prosecution had incorporated no fewer than seventeen otherwise inadmissible hearsay statements into the witness' testimony. 582 F.2d at 678. As we noted in *Check*, the witness there acted as a "transparent conduit for the introduction of inadmissible hearsay." *Id.* Herein, by contrast, the challenged testimony appears to have been admissible as a verbal act, serving to explain the circumstances of Vazquez' arrest on the street and appellant Figueroa's subsequent arrest in Room 638. Even if this were not the case, however, I am unpersuaded that the testimony itself had more than a very slight effect on the jury. *See Kotteakos v. United States*, 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946). Moreover, the majority's assertion that the testimony was the only evidence directly implicating Figueroa, see *supra*, 924, overlooks the evidence to the effect that Agent Caprio spoke on the telephone about a narcotics deal with a person whom he addressed as "Leo." That person did not object to being called Leo, and his voice matched an arresting detective's description of appellant Figueroa's voice. See *supra*, 911.

The prosecutor, however, relied heavily in summation upon the veracity of the challenged testimony, despite the fact that it had been admitted as only a verbal act. In spite of my reservations, because of this wholly inappropriate argument to the jury, I concur in the reversal and remand of the case for a new trial.