UNITED STATES of America, Appellee,

v.

Eric STANCHICH, Defendant-Appellant.

No. 502, Docket 76–1407.

United States Court of Appeals,
Second Circuit.

Argued Dec. 6, 1976.

Decided Jan. 6, 1977.

David J. Gottlieb, New York City (William J. Gallagher, and The Legal Aid Society, New York City, of counsel), for defendant-appellant.

Edward J. Levitt, U. S. Dept. of Justice, Washington, D. C. (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., and Lawrence B. Pedowitz, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before KAUFMAN, Chief Judge, and FRIENDLY and OAKES, Circuit Judges.

FRIENDLY, Circuit Judge:

Eric Stanchich was convicted, after trial before Judge Pierce and a jury in the District Court for the Southern District of New York, on two substantive counts of an indictment for counterfeiting. One count charged him and Alan Michael Fitzgerald with having possessed, passed and attempted to sell a $100,000 counterfeit treasury bill in violation of 18 U.S.C. §§ 472 and 2; another count charged them with transferring and delivering the same bill in violation of 18 U.S.C. §§ 473 and 2. At the end of the prosecution's case the court dismissed a count charging the defendants with conspiring to commit the substantive crimes, in violation of 18 U.S.C. § 371. Although both defendants were convicted and appealed, Fitzgerald's appeal was separated on his request. The grounds of Stanchich's appeal are that, in view of the dismissal of the conspiracy count, it was error for the court to allow the jury to consider against Stanchich on the substantive counts what are claimed to have been inadmissible hearsay statements by Fitzgerald and that even with, or particularly without, the alleged hearsay statements, the evidence against Stanchich was insufficient to warrant submission of the substantive counts.

Although the chain of events resulting in the conviction began in October 1975, two significant pieces of background were before the jury. In August 1974 one Alan Lurie, who was seeking to finance a business venture, endeavored to enlist Stanchich's aid. Stanchich offered counterfeit treasury bills to be used as collateral but Lurie refused. In March 1975 one Robert Della Porta, with an associate, attempted to pass counterfeit treasury bills to Lurie. Knowing that Stanchich and Della Porta were acquainted, Lurie asked Stanchich whether he was aware of Della Porta's attempt to pass the counterfeit; Stanchich replied that Della Porta had told him.

In the evening of October 28, 1975, after Lurie had decided to cooperate with the Government, he placed a tape-recorded call to Stanchich's home at the Secret Service's request. When no one answered, Lurie

placed a tape-recorded call to Fitzgerald. He told Fitzgerald that he had a "home" with a banker friend for very large quantities of the things that Stanchich's friend, Della Porta, had previously discussed with him. He asked Fitzgerald to arrange a meeting with Stanchich; Fitzgerald reported that Stanchich was in Europe but that Fitzgerald would call Lurie the following day.

Stanchich returned on October 30. On November 3 Fitzgerald telephoned Lurie that he had not yet spoken to Stanchich but had spoken to "his [Fitzgerald's] people" who told him a sample counterfeit bill was available. When Fitzgerald exhibited a counterfeit $100,000 treasury bill to Lurie the next day, Lurie asked if he could show the bill to "his banker." Fitzgerald replied that he would have to obtain permission from "his people." They met again later in the morning. Fitzgerald handed Lurie the $100,000 bill and said that "his people" wanted $20,000 for it. Lurie indicated this price would probably be acceptable; they arranged to meet again at 2:00 p. m. for Fitzgerald to pick up the bill.

Fitzgerald later agreed to postpone the return of the bill until the evening. After the bill had been photographed by the Secret Service, Lurie and Agent McDonnell, who was to pose as the "banker," met Fitzgerald. They returned the bill, with McDonnell pointing out that the word "payable" was misspelled. McDonnell told Fitzgerald he wished to deal in approximately $3,000,000 of bills. Fitzgerald quoted a price of 25% of face value with 10% payable on delivery; he agreed to speak with his people and arrange to close the deal in a week.

In the morning of November 10 Fitzgerald went to Lurie's office. He said that the spelling correction had been made and that "his people" had gone to a lot of trouble and expense in printing the $3,000,000 of bills and would want $20,000 to $25,000 immediately. Fitzgerald gave Lurie a sample of the corrected bill.

That afternoon McDonnell met with Fitzgerald in a Manhattan restaurant and re-turned the corrected counterfeit bill which Lurie in the interim had given to the Secret Service for photographing. Fitzgerald renewed his demand for $25,000, claiming he had told "his people" that he had been promised this. McDonnell insisted on doing the whole $3,000,000 deal at once. Fitzgerald agreed to endeavor to convince "his people" to that end. He was to meet McDonnell at the restaurant that evening and have an answer. The evening meeting proved inconclusive and Fitzgerald agreed to phone on November 12 at 9:15 a. m.

McDonnell left the restaurant on the north side of East 45th Street. He was followed by one Vincent Napoli. At the intersection of 45th Street and Madison Avenue, Napoli crossed to the south side and met Stanchich. Napoli then returned to the north side and continued to follow McDonnell while Stanchich proceeded on the south side. On reaching the Grand Central Station area McDonnell succeeded in evading Napoli and Stanchich; they conversed briefly, looked up and down Vanderbilt Avenue, then walked a short distance east on 45th Street, separated briefly, and then met again on the southwest corner of 45th Street and Madison Avenue.

At 8:45 a. m. on November 12, Stanchich, Napoli and Fitzgerald met and conferred for a half hour at a diner. After Stanchich and Napoli entered an automobile, Fitzgerald phoned McDonnell that he was having some difficulty. They agreed to meet at 11:00 a. m. at a downtown restaurant. Fitzgerald then entered the automobile and the three men drove downtown. Fitzgerald met McDonnell in a booth at the restaurant; Stanchich and Napoli sat two booths away. The conversation between McDonnell and Fitzgerald on the issue of immediate payment of $25,000 again proved inconclusive; Fitzgerald agreed to try again and call McDonnell at 12:15 p. m. McDonnell left the restaurant, walking east on Morris Street; he was followed shortly by Fitzgerald, who in turn was followed by Stanchich and Napoli.

Shortly before noon Fitzgerald and Napoli were seen having a heated discussion in

the lobby of 2 Broadway. Stanchich joined them a few minutes later. Shortly after noon Stanchich and Napoli were observed arguing there.

About 12:15 p. m. Fitzgerald telephoned McDonnell. He refused to deliver the $3,000,000 package at one time. It was agreed that he would deliver one $100,000 counterfeit treasury bill at 2:00 p. m. at the Blarney Stone bar, also in downtown New York, in return for $25,000 which he would give to his people; the remaining $2.9 million would come later.

In the interval before the agreed time for delivery, Stanchich and Napoli strolled around the Wall Street area, with Fitzgerald walking nearby. About 1:30 p. m. Stanchich returned to the garage where the car was parked and entered after some reconnoitering. At 2 o'clock McDonnell and Fitzgerald met outside the Blarney Stone bar. Fitzgerald took an envelope out of his jacket, gave it to McDonnell and told McDonnell that it contained the $100,000 treasury bill. They entered the bar and McDonnell opened the envelope.

McDonnell then remarked that he had seen Stanchich at the restaurant where they had met that morning and also had seen an unknown man with Stanchich and asked if they were in on the deal. Fitzgerald told McDonnell not to ask questions about his end of the deal. McDonnell persisted, however, and suggested that if Stanchich and the other person were in on the deal, Fitzgerald should call them in so that McDonnell could attempt to persuade them to do the entire $3 million package at one time. Fitzgerald refused, telling McDonnell that he would get rid of the two persons by the time McDonnell returned from the bank with the $25,000. McDonnell gave a prearranged signal and Fitzgerald was arrested. Meanwhile, shortly after McDonnell and Fitzgerald entered the Blarney Stone bar, Stanchich removed his car

from the garage and began to circle the area where the bar was located. About 2:05 p. m. Secret Service agents stopped the car and arrested him.

Stanchich's principal argument on appeal is that it was error for the judge to admit against him on the substantive counts what he contends to have been hearsay statements that could be properly admitted only if made by a fellow conspirator during the course of and in furtherance of the conspiracy, see F.R.Ev. 801(d)(2)(E)—a condition which he claims to have been negated by the court's dismissal of the conspiracy count.

Although Stanchich's counsel speaks of a "welter" of hearsay, he singles out for special notice Fitzgerald's October 28 statement that Stanchich was in Europe, his frequent statements that he would talk to "his people," and his statement in the Blarney Stone bar, immediately before his arrest, that he would get rid of Stanchich and the other person (Napoli) before McDonnell returned. The Government answers that the Europe statement was not admitted against Stanchich; that no objection was made to the majority of the "his people" references either when offered or at the time of the charge on the admissibility of evidence; that any error in the admission of the statements was harmless; that none of the statements were hearsay; and that in any event admission of the statements was proper under the standard for admission of statements of a fellow conspirator laid down in *United States v. Geaney*, 417 F.2d 1116 (2 Cir. 1969), *cert. denied sub nom. Lynch v. United States*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). Since we agree with the last position, we need not pass on the others.[1]

■ Our opinion in *United States v. Geaney, supra*, delineates the course to be followed in a case where declarations of a co-conspirator are offered against a defend-

---

1. Since the problem is a recurring one, we wish to make clear that we are neither accepting nor rejecting the Government's further argument that the "I will talk to my people" statements and even the offer to get rid of Stanchich and

Napoli were admissible apart from the conspiracy exception. If, after one or more of the various impasses between them, McDonnell had observed Fitzgerald going to a telephone, testimony to that effect, while, of course, not

ant. Although the judge may permit such declarations to be admitted "subject to connection" on a representation by the Government that sufficient connection will be produced,

> the judge must determine, when all the evidence is in, whether in his view the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence independent of the hearsay utterances. If it has, the utterances go to the jury for them to

consider along with all the other evidence in determining whether they are convinced of defendant's guilt beyond a reasonable doubt. If it has not, the judge must instruct the jury to disregard the hearsay or, when this was so large a proportion of the proof as to render a cautionary instruction of doubtful utility . . . , declare a mistrial if the defendant asks for it.

417 F.2d at 1120.

■ Such difficulty as has arisen here was due to the fact that, rather than fol-

---

hearsay, would be inadmissible against Stanchich since it would be irrelevant in the absence of some proof permitting an inference that he was the person on the other end of the line. Here the Government can argue that a statement by Fitzgerald that he was going to call or talk to a participant in his plan should be admissible if relevant, not as a verbal act as the telephone call would be, but under what McCormick recognizes to be the closely related hearsay exception for declarations of present state of mind, see McCormick, Evidence §§ 249 at 591 and 295 (1972). The exception allowing the admission of a declaration of a state of mind not simply to show the state of mind but a subsequent act of the declarant is, of course, the rule of *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892), which the Advisory Committee Note to Federal Rule of Evidence 803(3) expressly left undisturbed, and which the House Judiciary Committee Report, No. 93–650, meant to "limit" only by rendering statements of intent admissible solely to prove the declarant's future conduct, not the future conduct of another. However, just as in the hypothetical case of the observed telephone call, such a statement would be inadmissible on the ground of irrelevance against a particular defendant in the absence of other proof permitting an inference that he was one of the "people." Cf. *United States v. D'Amato*, 493 F.2d 359, 364–65 (2 Cir.), *cert. denied*, 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 50 (1974).

Fitzgerald's statement that he would get rid of Stanchich and Napoli would seem admissible under the *Hillmon* rule as explicated and applied in *United States v. Annunziato*, 293 F.2d 373, 377–78 (2 Cir.), *cert. denied*, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961), see also the well known case of *Lloyd v. Powell Duffryn Steam Coal Co. Ltd.*, L.R. [1914] A.C. 733, not as showing that he in fact did so, something which his arrest aborted, but that he had relations with the two men which would make this feasible. As Professor Morgan has shown, the trier of fact in *Hillmon* would necessarily draw the inference that Walters' assumption that he

was going with Hillmon was based on some previous arrangement between them. See Basic Problems of Evidence 293 (1954) and the discussion in *United States v. Annunziato, supra*, 293 F.2d at 377–78. In opposition to this analysis Stanchich relies on the characterization in *United States v. D'Amato, supra*, of a declaration by one Burdieri that he was going to meet "his people" as inadmissible hearsay for the purpose of determining the membership of one Abramo in the conspiracy. However, while that opinion does not apply the *Hillmon* exception to the "his people" statement, it relies on the *Hillmon* exception in regard to Burdieri's declarations to establish the existence of a conspiracy, 493 F.2d at 363–64 & n. 2. The view taken of the admissibility of Burdieri's "his people" statement to show Abramo's participation at that point in the analysis was unquestionably correct even if the statement were within the *Hillmon* principle since the opinion had not yet considered whether there was evidence to show that Abramo was one of Burdieri's "people," as the court subsequently determined that there was and that Burdieri's statement was thus admissible against Abramo under the *Geaney* standard. *D'Amato* in no way rejects the *Hillmon* exception involved in the statement of Fitzgerald that he would get rid of Stanchich and Napoli.

In point of fact the same available items of additional evidence often would suffice to support the admissibility of so general a declaration as proof that a particular defendant was part of the plan whether the declaration were considered to lie within the *Hillmon* exception but to be irrelevant in the absence of further proof that the defendant was one of the declarant's "people" or if admissibility were founded on the conspiracy exception and independent proof of the defendant's membership in the conspiracy is required. In many cases the question here mooted may thus be of greater theoretical than practical importance. In view of our holding that Fitzgerald's statements were properly admitted under the conspiracy exception, we can leave the argument as to the state of mind exception to another day.

lowing the sequence indicated in *Geaney*, the judge first dismissed the conspiracy count but then held that the independent evidence of Stanchich's involvement sufficed to allow admission of Fitzgerald's declarations against him on the substantive counts. Appellant argues that the same considerations that led the judge to dismiss the conspiracy count required him to hold the declarations inadmissible on the substantive counts. The argument overlooks the difference in the standards governing the two determinations.[2] In deciding whether the evidence is sufficient to warrant submission of a conspiracy count to the jury, the judge must determine, in the language of *Curley v. United States*, 81 U.S. App.D.C. 389, 160 F.2d 229, 232, *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947), which we quoted with approval in *United States v. Taylor*, 464 F.2d 240, 243 (2 Cir. 1972):

whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.

A judge may thus consistently find that the evidence (even including admissible hearsay declarations) did not meet the higher test required for submission of a conspiracy count to a jury,[3] although the independent evidence did meet the lower test required for admission of the declaration.[4]

When we review the record, the justification for the court's finding of sufficient independent evidence of Stanchich's participation to meet the preponderance test of *Geaney* becomes clear. On six occasions within the space of two days, Stanchich was surveilling Fitzgerald and McDonnell or meeting with Fitzgerald, at assorted

**2.** Judge Pierce recognized this. He distinguished between the *Geaney* and *Taylor* inquiries prior to ruling on the defendants' motions to dismiss and on the evidence questions. See Trial Tr. at 280.

**3.** The judge's dismissal of the conspiracy count seems to have rested largely on prudential considerations. Since he believed the Government had sufficient evidence to get to the jury on the substantive counts, which permitted higher sentences than the conspiracy count, he saw little purpose in retaining the latter. See Trial Tr. at 332–33.

**4.** This difference in standards has been noted by us before. See *United States v. Cafaro*, 455 F.2d 323, 326 (2 Cir.), *cert. denied*, 406 U.S. 918, 92 S.Ct. 1769, 32 L.Ed.2d 117 (1972). See also *United States v. Jacobs*, 475 F.2d 270, 284 n.28 (2 Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973).

We note that in *United States v. Oliva*, 497 F.2d 130 (5 Cir. 1974), the Fifth Circuit has adopted a standard more stringent than that in *Geaney*, namely, that a declaration of a co-conspirator may be admitted only if the independent evidence alone would support a jury finding of conspiracy; the opinion cites decisions of several other circuits which are said to support that view and recognizes that our decision in *Geaney* adopts a lower standard. With respect, we find nothing in *Oliva* or the cases there cited that vitiates the reasoning which led us to conclude as we did in *Geaney* that a preponderance is the proper test. The newly adopted Federal Rules of Evidence seem to give some reinforcement to that conclusion. The

rules apply to all proceedings, both civil and criminal, see Rule 1101(b), and the co-conspirator exception, Rule 801(d)(2)(E), is grouped with other admissions, individual or vicarious, many of which would arise in civil cases. Under Rule 104(a) preliminary questions concerning the admissibility of evidence are to be determined by the court. Surely a preponderance test would suffice to establish admissibility in a civil case, and Rule 104(a) makes no distinction as to the basis for deciding preliminary questions of admissibility as between civil and criminal cases. See also IX Wigmore, Evidence § 2550, at 503 n. 6 (1940), stating in the context of judicial rulings on admissibility that "the rule of *reasonable doubt* . . . has here no possible application." The holding in *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), that the voluntariness of a confession in a criminal case need only be shown by a preponderance of the evidence further explodes any theory that everything in a criminal case, including preliminary evidentiary questions, must be proved beyond a reasonable doubt. One commentator who suggests that the standard ought to vary still concludes that the preponderance standard is appropriate for the preliminary determination whether there is sufficient independent evidence of a defendant's membership in a conspiracy to warrant admission of declarations of a fellow member in furtherance thereof. See Saltzburg, Standards of Proof and Preliminary Questions of Fact, 27 Stan.L.Rev. 271, 303–04 (1975).

areas of New York City and varying hours of the night and day. On the day of the attempted sale of the $100,000 counterfeit treasury bill, both meetings between him and Fitzgerald were immediately followed by a telephone call from Fitzgerald to McDonnell about the terms of the deal. Stanchich was with Fitzgerald just before the latter produced the counterfeit bill and was watching for Fitzgerald just after delivery and payment were supposed to have occurred. It is true that every one of Stanchich's acts is susceptible of an explanation other than participation in the conspiracy. However, as we said in *Geaney*, 417 F.2d at 1121, "pieces of evidence must be viewed not in isolation but in conjunction." See also *United States v. Monica*, 295 F.2d 400, 401 (2 Cir. 1961), *cert. denied*, 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962). The mathematical chances that anyone not having an interest in facilitating Fitzgerald's sale of counterfeit to McDonnell would have engaged in the amount and nature of hovering and covering that Stanchich did are infinitesimal. Judges are not required to exhibit a naiveté from which ordinary citizens are free.

 When we turn to Stanchich's alternative contention, we find it equally plain that the evidence was sufficient to warrant submission of the substantive counts. Here, in addition to the evidence of Stanchich's acts just summarized, there are the similar act evidence of August 1974 and March 1975, Fitzgerald's statements at every important stage of the transaction about having to talk to his "people," of whom the jury could properly infer that Stanchich was one, and his final offer to get rid of Stanchich. This was the equivalent of asserting that Stanchich had been in on the deal—however unlikely it was that Fitzgerald could have made good on his offer to get him out of it. The judge correctly charged on the elements necessary to convict for aiding and abetting, carefully explaining:

> The mere presence of a defendant where a crime is being committed, even coupled with knowledge by the defendant that a crime is being committed, or the mere negative acquiescence by a defendant in the criminal conduct of others, even with guilty knowledge, is not sufficient to establish aiding and abetting. An aider and abettor must have some interest in the criminal venture.

The judgment of conviction is affirmed.