**UNITED STATES of America**

v.

**Giuseppe GAMBINO, et al., Defendants.**

**No. 9S 88 Cr. 919 (PKL).**

United States District Court, S.D. New York.

Dec. 8, 1992.

Order Clarified, Dec. 9, 1992.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City (James B. Comey, Patrick J. Fitzgerald, of counsel), for U.S.

Frederick H. Cohn, New York City, for Vittoria and Tommy Gambino.

Solomon Cohen, Brooklyn, NY, for Maria Gambino.

## OPINION AND ORDER

LEISURE, District Judge,

Giuseppe Gambino ("Joseph Gambino") was arrested on December 1, 1988, and released after executing a $1,000,000 bail bond, dated December 16, 1988, which was co-signed by certain individuals, including his wife, Maria Gambino, and secured by certain parcels of real property. Joseph Gambino also executed an additional $2,000,000 appearance bond on May 17, 1989. Giovanni Gambino ("John Gambino") was arrested on January 4, 1990, and released the following day on a $2,000,000 personal recognizance bond, co-signed by his wife, Vittoria Gambino, and his eldest son, Tommy Gambino, and secured by certain real property.

On September 1, 1992, defendant Joseph Gambino failed to appear in court at a scheduled hearing in violation of his bail conditions. The Government also informed the Court at that hearing that John Gambino never appeared for his previously approved appointment with his heart doctor in Houston on August 31, 1992 and, therefore, also had violated his bail conditions. At that time, the Court granted the Government's application, issuing arrest warrants for these two defendants. On September 20, 1992, FBI agents arrested Joseph and John Gambino at a hotel residence in Fort Lauderdale, Florida.

Pursuant to Rule 46(e) of the Federal Rules of Criminal Procedure, the Government has now moved the Court for forfeiture and entry of judgment against Maria Gambino, in her capacity as surety for defendant Joseph Gambino, for the $1,000,000 bond posted for Joseph Gambino and secured by certain property located in Staten Island. The Government has also moved for forfeiture and entry of judgment against Vittoria and Tommy Gambino, in their capacities as sureties for defendant John Gambino, for the $2,000,000 bond and the properties posted as collateral for John Gambino by these sureties. In response to this motion, the sureties for the defendants argue that certain actions by the Government have relieved them of their obligations under the bonds for Joseph and

John Gambino. More specifically, the key issue that must be resolved by the Court is whether the removal of the electronic bracelet monitoring devices from defendants constituted a significant change in the bail conditions and, if so, whether the sureties had notice of that occurrence. For the reasons stated below, the Government's motion for forfeiture and entry of judgment as to these sureties is granted.

## BACKGROUND

### Joseph Gambino

Following his arrest on December 1, 1988, Joseph Gambino was remanded by the Honorable Kathleen Roberts, United States Magistrate Judge, Southern District of New York. Magistrate Judge Roberts held a detention hearing and, on December 8, 1988, issued her final opinion detaining Joseph Gambino as a danger to the community, pursuant to 18 U.S.C. § 3142(e). Magistrate Judge Roberts made a specific finding that the Government had established that Joseph Gambino, through his high-ranking stature in a multi-faceted narcotics and racketeering criminal organization, had the ability to command the criminal acts of others and, thus, posed a danger to the community.

Subsequently, counsel for Joseph Gambino requested that Magistrate Judge Roberts modify her order to permit him to reside at the now-defunct Manhattan House Community Treatment Center ("Manhattan House"). Over the Government's objection, Magistrate Judge Roberts granted the motion on the basis of Joseph Gambino's need to prepare for trial and consult with his attorneys and, therefore, ordered the release of Joseph Gambino to Manhattan House with electronic bracelet monitoring and authorized the Government to install a pen register on his phone. Magistrate Judge Roberts also allowed Joseph Gambino to have weekly outside visits to his attorneys and directed him to execute a fully-secured $1,000,000 bond.

The Government appealed Magistrate Judge Robert's decision to the Honorable Milton Pollack, United States District

Judge, Southern District of New York, sitting in Part I. Judge Pollack upheld the order, with the following modifications: (1) with respect to the outside visits to his attorneys, Joseph Gambino's attorneys were required to escort him to and from their offices; (2) phone calls were permitted only with family and attorneys; and (3) only visits from designated family members were permitted. Prior to the issuance of this order setting forth the new bail conditions, Maria Gambino and six other co-signers executed a $1,000,000 appearance bond secured by certain parcels of real property.[1] The bond specifically noted, "This bond is being Co-signed as of 12/16/88, even before the defendant's bail conditions are finalized, as per order of Judge Pollack." The bond simply contained standard terms and did not incorporate any special provisions.

After repeated complaints from defense counsel that the Manhattan House was unduly restricting their ability to prepare for trial with their client, the Government consented to house arrest for Joseph Gambino with electronic bracelet monitoring, a pen register and wiretap authorization, and notice of visits. In February 1989, Joseph Gambino sought additional easing of the house arrest conditions. In recognition of the Court's concerns about the lengthy pretrial delay, the Government agreed to permit Joseph Gambino to work at Fernandez Construction, and later at Ray's Pizza in Manhattan. A second $2,000,000 personal recognizance bond was later signed by Joseph Gambino on May 17, 1989 and secured by real property in Cherry Hill, New Jersey.[2]

In September 1989, based on a new charge of witness tampering alleged in a superseding indictment against Joseph Gambino and based on surveillance of his activities, the Government sought to revoke Joseph Gambino's bail. The matter was referred to the Honorable Whitman Knapp, United States District Judge, Southern District of New York. Joseph Gambino was released on bail pending decision on the Government's bail revocation. After receiving affidavits from both sides and hearing argument on the issue, the Court found that willful violations had not been established and, thus, denied the Government's motion for remand. Subsequent to these proceedings, the Court issued orders which specifically listed approved visitors, locations, and activities permitted for Joseph Gambino.

*John Gambino*

Defendant John Gambino was arrested on January 4, 1990 and charged in a superseding indictment herein with narcotics and racketeering activities. At a detention hearing on January 5, 1990, the Government argued that John Gambino was a major organized crime figure and drug dealer who posed a significant danger to the community. However, in light of the previously unsuccessful efforts to detain Joseph Gambino, the Government consented to the release of John Gambino on strict bail conditions. On that same day, John Gambino was released on a $2,000,000 personal recognizance bond co-signed by Vittoria Gambino and Tommy Gambino, and secured by certain real property.[3] Certain conditions were specifically incorporated into the bond by reference and attached to the bond on a handwritten sheet. The bond was conditioned on house arrest, electronic bracelet monitoring, and the installation of a pen register on the phones in his home and at work. The terms of the release permitted John Gambino to work, visit his attorneys, attend religious services and medical appointments, and visit with pre-approved individuals at his home. In

---

**1.** With respect to Maria Gambino, the property at issue is located at 419 Woods of Arden Road, Staten Island, New York.

**2.** In 1990, the United States and Joseph Gambino entered into an agreement permitting him to sell the property located in Cherry Hill, New Jersey and, thus, it no longer serves as security for the $2,000,000 bond.

**3.** The properties at issue are: (1) the property located at 8007 Narrows Avenue, Brooklyn, New York in the name of Vittoria Gambino; and (2) the property located at 7502 18th Avenue, Brooklyn, New York, in the name of Tommy Gambino.

addition, John Gambino was required to submit a weekly schedule of his movements.

*Removal of the Electronic Bracelet Monitoring*

On July 7, 1992, the Government, in response to complaints by the Pretrial Services Agency ("Pretrial Services"), submitted a letter to the Court requesting permission to cease the electronic bracelet monitoring of both Joseph and John Gambino. In the letter, the Government noted that it had conducted a meeting with Pretrial Services concerning general problems with the electronic monitoring program. More specifically, the Government and Pretrial Services had concluded that the bracelet system was ineffective with respect to these defendants due to the frequent and lengthy "blackout" periods permitted to Joseph and John Gambino under the terms of their release, including visits to attorneys, physicians, employment, etc. The Government stated in the letter that its request was based on the fact that the electronic monitoring was "largely ineffective" and the numerous "on" and "off" transitions required by defendants' frequent approved visits placed an "enormous burden" on Pretrial Services. On July 8, 1992, this Court endorsed the Government's letter allowing removal of the bracelets.[4]

*Violation of Conditions of Bail*

On August 24, 1992, the Grand Jury returned an eighth superseding indictment in the case. The new indictment added a new murder charge naming both Joseph and John Gambino, while dropping six predicate acts of murder and an obstruction of justice allegation against Joseph Gambino. Moreover, the new indictment also named John Gambino in the "continuing criminal enterprise" charge for the first time. The Court scheduled the arraignment in the new indictment for September 1, 1992. On August 31, 1992, the Government submitted a letter to the Court stating its intention to move to remand Joseph and John Gambino following arraignment on the superseding indictment. The letter noted that the Government had informed defense counsel of this intention during the previous week. In addition, the letter noted that John Gambino was to be in Houston on Monday, August 31, 1992, for an appointment with his heart doctor.

Joseph Gambino failed to appear in court on September 1, 1992. At that time, his attorney, Edward S. Panzer, Esq., informed the Court that he had spoken by telephone with a woman he believed to be Joseph Gambino's wife who told Mr. Panzer that she had last seen Joseph Gambino leaving for work early that morning. The Government also informed the Court that it had contacted John Gambino's heart doctor in Houston and learned that John Gambino had never appeared for his scheduled doctor's appointment. The Court then granted the Government's application and issued arrest warrants for these two defendants.[5] On September 20, 1992, FBI Agents arrested Joseph and John Gambino at a hotel residence in Fort Lauderdale, Florida. The Government has moved for forfeiture and entry of judgment against surety Maria Gambino with respect to the bail securing the release of defendant Joseph Gambino in the sum of $1,000,000 [6] and against Vittoria and Tommy Gambino in the sum of $2,000,-

---

**4.** The Court notes that, even prior to this Order discontinuing this practice, John Gambino's electronic monitoring was not in effect. Indeed, John Gambino was not outfitted with the electronic bracelet at all in 1992. *See* Affidavit of Evans Kavallines, sworn to on November 16, 1992, at ¶ 7. After a Court order restoring him to bracelet monitoring in January, 1992, Pretrial Services was unable to outfit John Gambino with the bracelet because he was hospitalized due to illness. During the months after his return from the hospital, John Gambino was reporting by telephone to Pretrial Services and was without a bracelet at the time the Court ordered the discontinuance of the bracelets as to these defendants on July 8, 1992. *Id.*

**5.** Both defendants also failed to appear at a hearing on September 3, 1992.

**6.** By letter to the Court, dated December 1, 1992, the Government corrected an error in its initial moving papers by noting that the Government is only seeking judgment in the amount of $1,000,-000 against Maria Gambino. Maria Gambino was not involved in the additional $2,000,000 bond that subsequently was posted by Joseph Gambino.

000 with respect to the bail securing the release of defendant John Gambino.[7]

## DISCUSSION

### I. *The Legal Standard*

The sureties argue that the removal of the electronic bracelet monitoring devices from defendants Joseph and John Gambino without notifying the sureties was a modification of the conditions of the bond that discharged them of their obligation under the bond. The sureties rely heavily on a Supreme Court decision, *Reese v. United States*, 9 Wall. (76 U.S.) 13, 19 L.Ed. 541 (1869), which involved two criminal actions against a defendant for submitting false writings to the board of land commissioners and committing perjury. In *Reese*, the defendant was released upon a bond that required him to appear at the next regular term of the court in San Francisco and at any subsequent term. With the court's approval, but without the knowledge of the sureties, the Government and the defendant agreed to postpone the criminal actions against the defendant until two land grant cases pending against the defendant were resolved. In addition, the parties agreed that the defendant could return to his native country, Mexico, in the interim. However, the defendant never returned from Mexico and an order was entered forfeiting the bail. Based on these facts, the Supreme Court held that the parties' stipulation, with respect to the postponement of trial and permission for defendant to leave the country, was a change in the bond contract which discharged the surety. In reaching this decision, the Court noted:

Any change in the contract, on which they are sureties, made by the principal parties to it without their assent, discharges them, and for obvious reasons. When the change is made they are not bound by the contract in its original form, for that has ceased to exist. They are not bound by the contract in its altered form, for to that they have never assented. Nor does it matter how trivial the change, or even that it may be of advantage to the sureties. They have a right to stand upon the very terms of their undertaking.

76 U.S. at 21. Based on the *Reese* decision, the sureties argue in the instant case that the removal of the electronic bracelets from the Gambino defendants was a change in the bond contract that discharges them from any obligation. However, over the course of more than a century since *Reese* was decided, the courts in this Circuit, and elsewhere, have interpreted the holding of *Reese* more narrowly.

The leading case in the Second Circuit on this issue is *United States v. Egan*, 394 F.2d 262 (2d Cir.), *cert. denied*, 393 U.S. 838, 89 S.Ct. 116, 21 L.Ed.2d 109 (1968). In *Egan*, the district court issued an modified order, without notice to the surety, which changed the reporting obligations of the bailed defendants from daily visits to the marshal to reporting once every ten days. *Id.* at 265. When the defendants fled, the surety sought to be relieved of its obligation under the bail bond based upon this change in the defendants' reporting obligations. The surety argued that the lengthening of the reporting time enlarged the conditions of bail and "afforded the accused a longer getaway time" which enhanced their chances of absconding and,

---

7. At a hearing on September 3, 1992, the Court orally declared a forfeiture of the bail as against both Joseph Gambino and John Gambino pursuant to Rule 46(e)(1) and entered a written order entering judgment against these two defendants, dated October 5, 1992. On October 2, 1992, a second hearing was held, on notice to the sureties, at which time the Court heard from the parties and set down a briefing schedule with respect to the Government's motion for forfeiture and entry of judgment against sureties Maria Gambino, Vittoria Gambino and Tommy Gambino. Surety Maria Gambino did not make

a formal appearance at this hearing, but the Court was informed that she was in the process of obtaining counsel. Therefore, in an Order, dated October 5, 1992, the Court agreed to stay execution of judgment once a notice of appearance and opposition papers to Government's motion was filed on behalf of Maria Gambino. Such notice of appearance and opposition papers were subsequently filed and, thus, the Court has stayed the execution of judgment against Maria Gambino pending the Court's decision on the Government's motion.

therefore, the surety should have been notified of this development. *Id.* at 266. The Second Circuit affirmed the district court's rejection of the surety's argument by noting that the surety "apparently knew of and acquiesced in the change of the interval for reporting, and although more than a month and a half elapsed during which [the surety] could have required the defendants to report daily to itself as surety, it did not do so." *Id.* The Court did not have direct evidence of the surety's knowledge, but rather found that the surety was on notice by "drawing the fairly obvious inference" from the circumstances surrounding the modification of the reporting obligations—for instance, the Court noted that the surety was later represented by the same attorney who had represented the defendants. *Id.* at 267.

The Second Circuit interpreted *Reese* narrowly on the grounds that the bonds in *Egan* specifically authorized the court to issue orders relating to defendants' appearance and "[t]here is nothing in the bonds which call for notice to the surety if any such order or direction is issued, nor was there any enlargement of the limits of the bail." *Id.* at 266. The Court found such facts differ from the situation in *Reese* where a condition of the bail bond was actually modified without notice to the surety. Moreover, having found that the surety had notice of the modification in *Egan,* the Second Circuit noted in *dicta:*

> If the Government moves the court for a modification of the terms of the bond, it should give reasonable notice of the motion to the defendant and the surety. If it is the defendant in custody of the surety who moves for a modification of the bail terms, as in the present case, the surety must look to the defendant for notice of the motion or discover it itself from checking the court docket.

*Id.* at 267.

The only case in this Circuit which has attempted to interpret the dicta in *Egan* is *United States v. Robinson,* 453 F.Supp. 1 (S.D.N.Y.1977). In *Robinson,* the surety brought a motion to set aside the forfeiture of the bail bond because the surety was not notified that the bail had been increased to $100,000 *and* that the bond had been transferred to a superseding indictment. As an initial matter, the Court recognized that some jurisdictions have held that no notice to the surety is required unless the bond agreement contains a notice requirement. *Id.* at 3; *see, e.g., Stuyvesant Insurance Co. v. United States,* 410 F.2d 524, 526–27 (8th Cir.) ("The surety does not have to be notified every time the principal is to appear in court but instead should keep itself posted on when the principal is to appear in order to keep itself informed of any changes made by the court in accordance with the terms and purpose of the bond."), *cert. denied,* 396 U.S. 836, 90 S.Ct. 96, 24 L.Ed.2d 87 (1969); *United States v. Wray,* 389 F.Supp. 1186, 1191 (W.D.Mo.1975) (same); *United States v. Caro,* 56 F.R.D. 16, 19 (S.D.Fla.1972) (same).

However, the Court then held that, despite this authority, the *Egan* dicta sets "a minimal duty on the Government to notify the surety when its risk has been significantly increased and the surety is not likely to be aware of this fact." 453 F.Supp. at 3. While a literal reading of *Egan* dicta could arguably support requiring notice to the surety of *any* change in the conditions of bond, the Court found that notice is required under *Egan* only where there is a significant change in the bond that increases the risk of flight:

> *Egan* recognizes that a surety can not be expected to be constantly in court to monitor the proceedings. It also implicitly recognizes that neither the defense attorney nor the defendant can be counted upon to notify the surety when in many cases such notice will result in the surrender of the defendant by surety. *Rather, Egan stands for the notion that the surety must be notified when the Government becomes aware that the risk of flight has increased. The burden on the Government is a minuscule one and only arises when there has been a significant change in the bond.*

*Id.* (emphasis added).

Applying these principles, the Court found that, with respect to the increase in

the amount of the bond, actual notice could be reasonably inferred from certain facts. *Id.* at 3–4. With respect to the transfer of the bond to the superseding indictment, the Court held that *"Egan* does not require notice in this instance because it is not apparent that such a transfer increased the risk to the surety." *Id.* at 4. Moreover, the Court noted that the transfer of the bond to the superseding indictment occurred six months prior to defendant's disappearance and, thus, if the surety had been doing its job, "it would have learned of the superceding indictment long before [the defendant] fled." *Id.*

The interpretation of the *Egan* decision set forth in *Robinson* is persuasive. Accordingly, a modification in the conditions of bond will not relieve the surety of its obligation under the bond unless: 1) the modification in the conditions of bond constituted a change in the bond that significantly increased the risk of flight; and 2) the sureties did not have notice of the modification. The Court refuses to read *Egan* as requiring notice of *any* change in the bond conditions. The basic purpose of notice of modifications in the bond is to afford the surety an opportunity to withdraw as surety where the modification materially increases the risk of flight. Accordingly, where the modification is trivial and does not materially increase the defendant's ability to flee, notice of such modifications is simply not required under *Egan*. Sureties cannot circumvent their obligations under the bond agreement by pointing to the failure to notify them of an insignificant modification in the bond conditions which had no practical effect on the risk of flight. Similarly, even when notice is required, the Government need not show direct knowledge by the surety, but rather the Court can draw obvious inferences from the particular facts of the case.

Decisions in several other circuits provide added support for this conclusion. In *United States v. Jones,* 719 F.2d 110, 112 (5th Cir.1983), *cert. denied,* 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 185 (1984), the defendant fled while out on bail and was re-arrested by the Drug Enforcement Administration (DEA). The DEA then re-leased him again based upon his promise of undercover cooperation, without notifying the court or the surety. *Id.* at 111. When the defendant fled again, the surety, relying on *Reese,* contended that it should be relieved from liability under the bond because the DEA recaptured and released the defendant without notifying the surety and such action increased the risk under the bond. *Id.* The Fifth Circuit interpreted the Supreme Court's decision in *Reese* as holding that "exoneration might be found warranted or at least equitable when the government's action has *unreasonably increased the surety's risk* that was reasonably contemplated by issuance of the bond." *Id.* at 112 (emphasis added). Applying this standard, the court held that the surety "did not sustain any additional risk beyond those contemplated by its bond simply because the DEA agents released Jones without surrendering him to the court." *Id.* Thus, the Fifth Circuit upheld the district court's forfeiture order on the grounds that the surety apparently knew of the defendant's rearrest and did not move for relief from the bond when it had the opportunity to do so. *Id.*

Similarly, in *United States v. Casey,* 671 F.2d 975 (6th Cir.), *cert. denied,* 458 U.S. 1108, 102 S.Ct. 3489, 73 L.Ed.2d 1370 (1982), the sureties argued that the failure to notify them of a transfer of bail to the superseding indictment, which added two new possession of narcotics counts, discharged them of their obligations under the bail bond. The Sixth Circuit recognized "the general principle that a material increase in risk discharges a surety." *Id.* at 977. However, the court then rejected the sureties' claim and held that it "[did] not believe that the addition of those particular charges to a multicount indictment which already included more serious narcotics violations significantly increased the likelihood that [the defendant] would jump bail." *Id.* The court also noted that the sureties had "effective notice" of the new indictment, *inter alia,* by their presence at a hearing, prior to the issuance of the superseding indictment, where the Government alerted

the court that the defendant might be facing additional drug charges. *Id.*

Finally, in *United States v. Hesse,* 576 F.2d 1110 (5th Cir.1978), the surety contended that he had only signed the bond in the case filed before the Magistrate and did not consent or agree to his bond being applied to the filing of subsequent indictments in the district court against the defendant with respect to the same transactions. The surety argued that the Government's failure to notify him of the increased risk resulting from the filing of the subsequent indictments discharged him from liability when the defendant fled. *Id.* at 1112. The Fifth Circuit held that the surety's contention as to the new indictments "would be valid only if the indictments can be said to have increased the bondsman's risk." *Id.* at 1113–14. The court then refused to find that such additional risk existed. Moreover, in finding that the surety understood the risk, the Fifth Circuit looked to the surety's "own conduct as evidence of his understanding of the risk undertaken in the bond agreement" along with evidence that the surety "received actual notice of the arraignments after the indictments were returned." *Id.* at 1114.

II. *Significant Increase in the Risk of Flight*

■ The sureties argue that the removal of the electronic bracelet monitoring from defendants Joseph and John Gambino re-

quired notice to the sureties.[8] The Court finds that, under the circumstances of the instant case, the removal of these bracelets did not significantly increase either of the defendants' risk of flight and, thus, notice was not required.

It is a common misconception among the public that electronic bracelet monitoring allows the Government to pinpoint a bailed defendant's precise location at all times as if by some type of radar or scanning device. The actual capabilities of these bracelets are far less extraordinary. The purpose of the device is simply to notify law enforcement when the defendant has left his home without prior authorization from the Government.

The Court was provided with details as to the operation of the electronic bracelet monitoring by Pretrial Services Officer Evans Kavallines, who is the officer principally responsible for the supervision of such monitoring in this district and was also the officer assigned to the pre-trial supervision of Joseph and John Gambino. *See* Affidavit of Evans Kavallines, sworn to on November 16, 1992 ("Kavallines Affidavit"). When a defendant is subjected to electronic bracelet monitoring, a device is usually placed around the defendant's ankle. The device transmits an encoded signal by radio frequency to a receiver located in the defendant's home and the receiver is capable of transmitting a signal by telephone to a computer at a central monitoring office at

---

8. As a threshold matter, the Court notes that the bond agreement signed by Maria Gambino did not specifically contain the electronic bracelet monitoring as a condition of bond. The bond that Maria Gambino signed expressly stated, "This Bond is being Co-signed as of 12/16/88, even before the defendant's bail conditions are finalized, as per order of Judge Pollack." Maria Gambino argues that the Government's failure to incorporate the original bail conditions into the bond at the time of execution discharges her obligation under the bond. As noted above, the agreement signed by Maria Gambino specifically states that the bail conditions were not yet finalized. Given the plain terms of the agreement, the Court finds this argument to be without merit.

On this same issue, the Government argues that, since the bracelet was not a special condition of the bond executed by Maria Gambino,

the removal of the bracelet is not a breach of the plain terms of the bond agreement and Maria Gambino has no grounds upon which to attack the Government's conduct. *See, e.g., United States v. Egan,* 394 F.2d at 266 (no valid claim based on court's modification of defendant's reporting requirements where bond terms did not require "notice to the surety if any such order or direction is issued"). For purposes of this motion, the Court will assume *arguendo* that the bond agreement implicitly incorporates the specific bail conditions which were later enumerated and, thus, will address the merits of Maria Gambino's claims regarding lack of notice with respect to certain occurrences, including the removal of the electronic bracelets from defendant Joseph Gambino. However, the Court notes that the Government has not waived its position on any appeal of this opinion and order.

a private facility. Kavallines Affidavit, at ¶ 2.

If the company fails to receive a signal from the defendant and is unable to verify that there has been a technical malfunction, the private company contacts a Pretrial Services Officer. The officer then attempts to contact the defendant's home by telephone. If the defendant answers the telephone and circumstances indicate there is an equipment malfunction, then the officer must travel to the house to make repairs or provide new equipment. If the defendant does not respond to the telephone call or there is a busy signal, the officer must report to the home to see if the defendant is there. If it is determined that the defendant is not home, law enforcement agents are contacted so that the search for the individual can begin and an arrest warrant can be sought. Kavallines Affidavit, at ¶¶ 2, 3.

According to Pretrial Officer Kavallines, the system "has not proven an effective means of preventing flight" due to several systemic flaws. Kavallines Affidavit, at ¶ 6. First, the system is subject to frequent technical malfunctions and "false alarms" caused by, *inter alia*, defendants straying to remote areas of the home, battery failure, or a malfunction in the telephone line, including a busy signal. *Id.* at ¶ 2. Most alerts to the Pretrial Services turn out to be false alarms. *Id.* at ¶ 3. Thus, both the private monitoring company and Pretrial Services take certain steps when the alarm is triggered, such as calling the defendant's home by telephone, to try to determine if there has been a false alarm. *Id.* at ¶ 3. These false alarms cause confusion within the monitoring system and delay in the response time.

Second, as noted earlier, the bracelet does not have a radar or scanning device that allows law enforcement to trace the defendant's precise location, but rather simply provides notification that the defendant may have left the house without prior approval and allows law enforcement to travel to the defendant's house to ascertain the situation. However, the various steps taken when an alarm is triggered—*i.e.* receiving the alarm, ascertaining if it is a false alarm, notifying Pretrial Services, and then travelling to the defendant's house—provide the defendant with a significant "headstart" if such defendant has indeed fled. Officer Kavallines stated in his affidavit that "[i]t is fair to say that a defendant outfitted with an electronic bracelet who decides to flee will usually obtain a sufficient headstart to have reached an airport before law enforcement agents can begin the search for that defendant." Kavallines Affidavit, at ¶ 3.

The third, and perhaps most significant flaw, is that many defendants placed on electronic monitoring are also entitled to lengthy "black-out" periods under the terms of their release. During these periods, the bracelet is turned "off" and the defendant is free to travel to work, restaurants, lawyers' offices, doctors, religious ceremonies, etc. Thus, if these "black out" periods are lengthy, the defendant can simply flee during a long "black out" period and further augment the headstart inherent in the bracelet monitoring, as described above.[9] Kavallines Affidavit, at ¶ 4.

It was primarily this problem with "black out" periods that led the Government to request the removal of the electronic bracelets as to defendants Joseph and John Gambino in the summer of 1992. In a letter to the Court, dated July 7, 1992, the Government informed the Court that the electronic bracelets were ineffective and requested that the Court order their discontinuance. After first recognizing there were many problems with the electronic monitoring program in general, the Government noted

9. In his affidavit on this issue, Pretrial Officer Evans Kavallines noted that "in light of the extraordinary burdens placed on Pretrial Services by the electronic bracelet monitoring requirements, with little assurance that a defendant would not flee, Pretrial Services, after consultation with the United States Attorney's Office, recommended that such monitoring be opposed in the Southern District of New York." Kavallines Affidavit, at ¶ 6. Officer Kavallines also noted that "[o]ne of the most compelling cases for discontinuing the electronic bracelet system was the case involving the Gambino brothers, whose bracelets were constantly being turned on and off and provided little assurance that they would not flee." *Id.*

that, given the bail conditions of Joseph and John Gambino, the bracelet monitoring was particularly ineffective and burdensome to the Government in the instant case. Under the bail conditions, Joseph and John Gambino were permitted to travel to work, their lawyer's offices, restaurants, doctors, health clubs, religious ceremonies, and even haircut appointments, after providing the Government with an advance schedule of their planned activities.[10] Thus, the bracelet would be "off" for extended periods of time each day to allow the defendants to engage in these scheduled activities and, as a result, was ineffective in preventing flight. Moreover, the Government also noted in the letter to the Court that the numerous "on" and "off" transitions required by these frequent visits were a burden to the Pretrial Service officers. Based upon these representations, the Court endorsed the letter requesting the discontinuance of the electronic monitoring.

The Court finds that, where the release conditions of Joseph and John Gambino permitted the electronic bracelets to be off for extended periods each day (usually over eight hours), the removal of such bracelets clearly did not significantly increase the risk of flight. The inability of the electronic bracelets to prevent flight in the instant case is perhaps best illustrated by the circumstances which led to flight by these two defendants. According to his counsel, prior to Joseph Gambino's failure to appear at the September 1st hearing, he was last seen leaving for work, which would have been a lengthy "off" period under electronic monitoring. Similarly, at the time John Gambino fled, he was allegedly travelling to visit a physician in Texas and, therefore, his entire multi-day trip would have been an "off" period under electronic monitoring. These facts provide a clear illustration as to why the bracelets were considered ineffective in preventing flight given the bail conditions in the instant case.

Moreover, despite the removal of the bracelet, the Government left all of the

other bail conditions in place including receiving advance daily schedules from both Joseph and John Gambino and approving all movement by them outside the home. Thus, any significance as to the removal of the bracelets is further minimized by the existence of the other stringent bail conditions that remained in effect. The Court emphasizes that it is not ruling that, in every case, the removal of the electronic bracelets would not constitute a significant increase in the risk of flight. Instead, the Court holds that under the specific circumstances of the instant case, which include lengthy "black out" periods, as well as stringent reporting requirements aside from the bracelet monitoring, the removal of the electronic bracelets did not significantly increase the risk of flight such that failure to notify the sureties of this modification discharged them of their obligation on the bonds.

In addition to the claim regarding the removal of the electronic bracelet, Maria Gambino, surety for defendant Joseph Gambino, also argues that the Government's failure to notify her of the scheduled arraignment on the superseding indictment, or to notify her of the Government's intention to seek detention of Joseph Gambino at the arraignment, discharged her obligation under the bond. These two contentions raised by Maria Gambino do not concern situations where the terms of the bond were actually violated in any way, but rather simply relate to notification of the surety as to scheduled court appearances by the defendant, as well as the subject matter of that appearance. However, there was no requirement in Joseph Gambino's bond that the Government notify the sureties of such events. Therefore, the Government argues that surety Maria Gambino cannot argue that there has even been a technical violation of the bond agreement. *See generally United States v. Egan*, 394 F.2d at 266 (where the express conditions of the bond stated that the defendants would have to make court ap-

---

**10.** The defendants could also travel out-of-state if they obtained prior approval from the Government, as illustrated by the Government permitting John Gambino to travel to Texas for an appointment with a heart doctor.

pearances as directed by the court "[t]here is nothing in the bonds which call for notice to the surety if any such order or direction is issued, nor was there any enlargement of the limits of the bail").[11]

■ The Eleventh Circuit's decision in *United States v. Craft*, 763 F.2d 402, 404–05 (11th Cir.1985) provides strong support for the position that, where the bond does not require notice to the surety of defendant's scheduled court appearances, the notice rule of *Egan* and *Robinson* is simply not triggered. In *Craft*, the defendant fled just prior to a hearing which would address the government's motion to modify the terms of bond and to place the defendant in custody. *Id.* at 403–04. As a result of the flight, the terms of the bond were never modified. Instead, the Government subsequently moved for judgment on the forfeited bond. The surety, citing *Egan* and *Robinson*, argued that its bond obligation should be discharged due to the Government's failure to notify it of the hearing where the court would be considering changing the terms of bond and placing the principal defendant in custody. *Id.* at 404–05. In rejecting this argument and upholding the forfeiture, the Eleventh Circuit noted that the general rule is that where the bond is silent "the surety generally is not entitled to special, separate notice of the principal's required appearances." *Id.* at 404. After reviewing the *Egan* and *Robinson* decisions, the Eleventh Circuit held that the general rule not requiring notification of such appearances is still applicable even where the hearing involves a motion to change the terms of the bond and that the limited exception to the general rule established in *Egan* and *Robinson* did not

dictate a contrary result under those circumstances.[12]

■ The Court finds the reasoning in *Craft* to be persuasive in the instant case. However, even assuming that the Eleventh Circuit's analysis is incorrect and the *Robinson* and *Egan* rule applies to the scheduling of the arraignment in the instant case, this Court finds that the new indictment against Joseph Gambino did not significantly increase the risk of flight such that notice was required. The eighth superseding indictment simply dropped six murders against Joseph Gambino and added one new murder. Under both the seventh and eighth superseding indictments, Joseph Gambino faced mandatory life imprisonment. Thus, the Court finds that the superseding indictment did not significantly increase defendant Joseph Gambino's risk of flight. *See United States v. Casey*, 671 F.2d at 977 (holding that a superseding indictment did not significantly increase the risk of flight where the indictment simply added new drug charges "to a multicount indictment which already included more serious narcotics violations"). Under such circumstances, notice to Maria Gambino of the arraignment on the superseding indictment is not required.

### III. *Notice Requirement*

■ Finally, even assuming that the removal of the electronic bracelets was a significant increase in the risk of flight that required notice to the sureties, the Court finds that notice to the sureties can be inferred from the facts in this case. As the Court noted in *Robinson*, the Government has a duty "to notify the surety when its risk has been significantly increased and *the surety is not likely to be aware of this*

11. The Agreement of Forfeiture signed by the sureties in the instant case contains almost the exact language concerning court appearances found in the bonds at issue in *Egan*. *See* Affirmation of James B. Comey in Support of Judgment of Default on Forfeiture of Bond, dated September 4, 1992, at Exhibits A and B.

12. The court distinguished *Egan* and *Robinson* on the grounds that in those cases the terms of the bond were actually changed while, in *Craft*, the issue related to a scheduled hearing, which did not occur because the defendant fled, and

no terms of the bond were ever modified. The circumstances in the instant case, with respect to the September 1st hearing involving arraignment on the superseding indictment and the Government seeking revocation of Joseph Gambino's bail, can be similarly distinguished. The arraignment on the eighth superseding indictment as to Joseph Gambino did not take place because the defendants fled prior to the hearing and, thus, the bond was not transferred to the eighth superseding indictment.

*fact."* 453 F.Supp. at 3 (emphasis added). Courts do not require the Government to show that the sureties had direct knowledge of the modification; rather, notice to the sureties can be reasonably inferred by the Court. *See United States v. Egan,* 394 F.2d at 267 (affirming the district court's finding that surety had notice by "drawing the fairly obvious inference" from the circumstances); *United States v. Robinson,* 453 F.Supp. at 4 (knowledge was reasonably inferred from the circumstances that the surety had notice of the increased bond).

The Court finds that the surety's knowledge of the removal of the bracelet can reasonably inferred in the instant case. First, the sureties in the instant case are immediate members of the defendants' family—the wife, Vittoria, and the eldest son, Tommy, of defendant John Gambino, as well as the wife, Maria, of defendant Joseph Gambino. Second, the electronic bracelet had been strapped to the respective defendants' ankle and the absence of such bracelets would be readily apparent to immediate family members.

Moreover, as the Government has noted, John Gambino was not subjected to electronic bracelet monitoring for almost eight months prior to his flight. *See* Kavallines Affidavit, at ¶ 7. Similarly, with respect to Joseph Gambino, a two-month period elapsed between the removal of the electronic bracelets and Joseph Gambino's flight. Given the lengthy period of time that elapsed between removal of the bracelets and the flight of both defendants, the Court can reasonably infer that the sureties, as immediate family members of the defendants, "were likely to be aware" that the respective defendants were no longer wearing an electronic bracelet strapped to their ankle.[13] This is a fairly obvious inference and there is no requirement that the Government provide direct evidence of actual knowledge by the sureties.

The same reasonable inference of notice can be drawn with respect to the Government's intention to arraign Joseph Gambino on a superseding indictment and to move to remand him at the September 1st hearing. Since Joseph Gambino knew of these developments prior to flight, it can be inferred that Maria Gambino, as Joseph Gambino's spouse, was "likely to be aware" of the hearing and its subject matter. As the Second Circuit has noted, " '[j]udges are not required to exhibit a naivete from which ordinary citizens are free.' " *United States v. Cicale,* 691 F.2d 95, 105 (2d Cir.1982) (*quoting United States v. Stanchich,* 550 F.2d 1294, 1300 (2d Cir.1977)), *cert. denied,* 460 U.S. 1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983).

## CONCLUSION

For the reasons stated above, the Government's motion for forfeiture and entry of judgment against sureties Vittoria Gambino and Tommy Gambino in the sum of $2,000,000, and against Maria Gambino in the sum of $1,000,000, hereby is granted. The stay of entry of judgment against Maria Gambino hereby is lifted.

SO ORDERED.

---

13. With respect to Vittoria Gambino, there is additional evidence which supports the inference that she knew that John Gambino was not being required to wear his electronic bracelet. Pretrial Services Officer Kavallines stated in his affidavit that, after a court order restored John Gambino to electronic bracelet monitoring in January 1992, he visited John Gambino's home to outfit him with the bracelet, but was informed that Gambino was in the hospital. When visiting the home, Officer Kavallines spoke with Vittoria Gambino about his attempt to outfit John Gambino with the bracelet:

The night before my visit, I called the Gambino home to inform them that I would be arriving the next day to affix the bracelet to Mr. Gambino. When I arrived on January 23, 1992, I spoke with Mrs. Gambino and informed her of my visit and she informed me Mr. Gambino was in the hospital. During the months after his return from the hospital, Gambino was reporting by telephone to me without a bracelet until this Court issued an order in the early summer of 1992 removing John Gambino from electronic monitoring at the joint request of my agency and the United States Attorney's Office.

Kavallines Affidavit, at ¶ 7.